EUGENE E.F.W. REID, et. al., Appellants,

v.

PUAILOA TAVETE, et. al., Appellees.

High Court of American Samoa
Appellate Division

AP Nos. 14, 15, and 16-82

March 30, 1983

Before MURPHY, Associate Justice, presiding, KING*, Acting Associate Justice, WILKINS**, Acting Associate Justice, FAOA, Associate Judge, and TAUPULE, Associate Judge.

PER CURIAM.

## STATEMENT OF THE CASE

Plaintiff-Appellant Reid commenced two separate actions in the Trial division of the High Court of American Samoa on behalf of the Church of Jesus Christ of Latter Day Saints (the Mormons) to evict and enjoin two separate families from land known as "Malaeimi." ( LT No. 007-79 and LT No. 41-79). The cases, having common issues of fact and law, were eventually consolidated for trial. Each family filed responsive pleadings. Though inartfully pleaded, the defendant families below asserted a claim of communal ownership and superior right to possession of the lands upon which the plaintiff church claimed they had tresspassed. The trial court apparently construed their assertions as affirmative defenses or counterclaims and thereupon determined the rights of the parties to the slightly more than 313 acres in dispute, and another 60 acre contiguous parcel. The record indicates that other interested parties attempted to intervene but no ruling was made on their motions. Some of these persons have filed an Amicus Curiae brief in this appeal. Their arguments will be addressed herein.

85

## FACTS

The pertinent facts in this case began when the disputed land was leased by the Matai Puailoa to the representative of the Mormon Mission around the turn of the century. The lease is mentioned in a decision published in 1909 by the High Court, Alo Taisi v. Puailoa, 1 ASR 194 (1909). That decision indicates that the Mormons leased communal land from the senior matai of the Puailoa family:

> "The defendant's claim of ownership arises from the undisputed overlordship of the name Puailoa over all Malaeimi not controlled by Fanene, a Malaeimi chief of equal rank." Id. at 195.

The court further described various other indicia of the communal nature of Malaeimi, giving a brief history of its cultivation and defense by Puailoa and Fanene.

The subject properties next came before the High Court in 1931 in the matai case of Nouata of Nu'uuli v. Pasene of Nu'uuli (LT No. 18-1931). Apparently, Puailoa Vaiuli, the matai who had leased the land to the Mormons, had died in 1929. The church was uncertain to whom it should make rental payments.

The court, in awarding the matai title to Nouata, mentioned that Malaeimi was land of the Puailoa family, but also ordered that the widow of the late Puailoa should have, during her life time, the rents from that part of Malaeimi leased to the Mormons ($10.00 per month). The lease expired and in the mid 1940's was re-negotiated with the widow for $360.00 per year ($1 per acre). In 1953, in exchange for $30,000, the widow executed a Common Law Fee Simple deed to the Mormons.

In 1978, the Puailoa family sought to renew the matter via a motion for new trial in the 1931 decision (The widow had died in the interim). The trial court denied the motion. That denial was upheld by this court on different grounds. Nouata of Nu'uuli vs. Pasene of Nu'uuli (AP No. 007-79, July 11, 1980). That decision contains a rehash of most of the facts above stated. In the instant case, the trial court undertook to finally resolve the status of the subject property on the merits.

## HOLDING OF THE TRIAL COURT

Trial of the matter commenced on March 2, 1982 and on April 19, 1982 the trial court entered its decision and order. It held that the land Malaeimi is communal land of the Puailoa family; that the 1953 deed was void ab initio, that the survey prepared in 1981 by Meko Aiumu, Chief of the Lands and Survey in American Samoa, establishes the exact location of the 313.61 acre subject property, and that the Fanene family has no interest in or right to the subject land. The court further ordered that any leases that the church may have given are cancelled, that a historical wall on the property be preserved and the order of preservation enforced by the Historical Site Preservation Council, that a 60 acre parcel contiguous to the property is communal land, and that a lease on a portion of that proprety, given to Burns Philp, be cancelled.

## QUESTIONS PRESENTED

1. Was the trial court's conclusion that the disputed land is communal supported by the evidence?

2. Did the trial court act arbitrarily in determining the rights of the parties in the disputed land?

3. Did the trial court err in its conclusion regarding the extent and nature of the interest acquired by the church?

4. Did the trial court exceed its jurisdiction in determining the rights and liabilities of persons not before the court?

## CHARACTER OF THE LAND

At the outset, though clearly not within the contemplation of the trial court, we are compelled to note certain aspects of the treaty obligations still possessing force and effect greater than all law but the United States Constitution, by which the Samoan way of life is protected. We begin with the General Act -- Samoan Islands, Treaty of Berlin (June 14, 1889), Fourth Declaraction:

> A declaration respecting titles to land in
> Samoa, restraining the disposition thereof by claims
> thereto and for the registration of valid titles.

The particulars of the fourth declaration are embodied in Article IV wherein lies the restriction against the alienation of native land. The first declaration and Article I grants Samoans the right to governance in accordance with their customs.

These protections were later embodied in the Treaties by which Eastern Samoa was ceded to the United States and the revised Constitution of American Samoa as approved by the President's delegate. The Cession of Tutuila and Aunu'u, (April 17, 1900) guarantees "preservation of the rights and property of the inhabitants of said island.., their lands and other property...," and respects the authority of the chiefs. The Cession of Manu'a Islands (Feb. 14, 1904) states that "the rights of the chiefs in each village and of all people concerning their property according to their customs shall be recognized". Article I, section 3 of the revised Constitution of American Samoa grants authority to legislate against the alienation of land and the destruction of the Samoan way of life, and to enact measures to protect "lands, customs, culture, and traditional Samoan family organizations." Seui v. Mata'afa, 4 ASR 33 (1963); Mulitauopele v. Paleafei, 3 ASR 93 (1953); To'omata v. Vea, 2 ASR 564, (1950).

These provisions, fairly read, do not carve "Fa'a Samoa" into stone. Rather, they insulate the same from erosion due to any influence other than the natural progression of time. They are not intended to force the retention of custom, culture, and tradition upon Samoans, but instead to assure that the Samoan way of life is allowed to follow its own path. As such, these provisions establish a presumptin in favor of the customs and traditions prevailing in the Territory.

The hallmark of the Samoan way of life is the communal land system. Without communal land, a Matai has little purpose. There is nothing new about communal land. It is the original form, the essence of what all the afformentioned provisions sought to protect. Since all land was once communal land, there is a presumption that all land still is. It is this presumption that any entity asserting that a given parcel is anything other than communal land must inevitably overcome.

\* \* \*

The conclusion of the trial court that the land in dispute was the communal land of the Puailoa family at the time the widow attempted to deed it to the Mormon Church is affirmed.

## PUAILOA FAMILY'S RIGHT TO THE LAND

Having concluded that the disputed land was communal at the time of the purported sale, it was incumbent upon the court to determine that it belonged to one or more families, or had instead been alienated by operation of law, See ASCA section 37.0120, or by the appropriate matai in accordance

with the strict procedures relating thereto that were in effect in 1953. See, e.g., Mata v. Soliai, 3 ASR 108 (1954); Satele v. Afoa, 1 ASR 424 (1930); Sione v. Tiuali'i, 3 ASR 66 (1953); Mulitauaopele v. Paleafei, 3 ASR 93 (1953).

There being no evidence whatsoever before the court to indicate that a transfer by a matai with the consent of the family and the approval of the governor had occurred, the trial court properly concluded that it had not. Since a family member cannot adversely possess communal land, there could be no tacking and the operation of law could not vest title in the less than thirty years involved in the instant case regardless of the manner of possession (see ASCA section 37.0120(a).[1]

By implication, the court could not then have concluded that title to the disputed land had passed to the Mormons. The land was communal and the families claiming the right thereto were before the court. It was therefore properly within the province of the court below to determine their respective interests. Title was vested without discussion: "We further hold that Malaeimi is and always had been the communal property of the Puailoa family."

\* \* \*

We thus conclude that the lower court was not "clearly erroneous" in vesting title to the communal land before it in the Puailoa family.

## CHURCH'S INTEREST

ASCA section 37.0204(D) provides in part:

> This section does not prohibit the coneyance and transfer of native land [for governmental purposes, to the U.S. or American Samoa Government or an agent thereof, upon approval of the governor] to an authorized, recognized religious society, of sufficient land for erection thereon of a church, a dwelling house for the pastor, or both; provided, that the conveyance and retransfer of such land shall be to native Samoans only and in the discretion and upon the approval of the governor.

This law does not contravene the aforementioned treaty in that it is consistant with the Samoan custom by which the matai may assign a parcel of communal land for use by an assignee so long as the the assignee exists and serves the matai. Such service may consist of the provision of a religious program. ASCA section 37.0204(d) alone provides the authority by which the Mormon Church may continue to hold that land necessary for the continuation of its religious enterprise. Togia v. Aumua, 3 ASR 3 (1951), had previously authorized the dedication of that much communal land as is necessary for church service. We note that the record amply establishes the donative intent of the Puailoa Matai, commencing with the original lease, and all pertinent Governmental approvals. The interest thus held continues so long as the church continues and need not be labeled in any way. However, if the contemplation of the statute is to be given a name, it would be an easement in gross.

---

1. Although we have addressed the merits of Appellant Reid's adverse possession claim, in order to expose the weakness thereof, we are also compelled to consider the adverse possession statute itself. Adverse possession is a method by which land may be alienated and acquired.

## JURISDICTION

The judgment of the trial court purported not only to affect the status of the land claimed by the Mormon church, but also the status of an additional 60 acres to which the church had no connection, and, as well, addressed the rights and liabilities of several persons who were not parties to the action. The trial court eventually terminated the property rights of several individuals without their knowledge and without granting them an opportunity to defend their interests.

Elementary concepts of due process require notice and a hearing prior to the deprivation of property rights. Fuentes v. Shevin, 407 U.S. 67, 80, 40 L.Ed. 2d 558 (1972); Armstrong v. Manzo, 380 U.S. 545, 547, 14 L.Ed. 2d 62 (1965). One is not bound by a judgment resulting from litigation in which he is not designated as a party and to which he has not been made a party by service of process. Hansberry v. Lee, 311 U.S. 32, 40, 85 L.Ed. 22 (1940); Eb. Elliot Adv. Co. v. Metropolitan Dade County, 425 F2d 1141, 1148 (5th Cir.), cert. denied 400 U.S. 805 (1970).

Those portions of the decision of the trial court attempting to dispose of property not claimed by the Mormons and affect the rights of individuals who were not parties to the litigations were erroneous and are reversed.

## CONCLUSIONS

The decision of the trial court is afirmed in part, modified, and reversed in part. As to the right of possessin of the disputed land set forth in the pleadings and described by the trial court as the 1981 survey by Meko Aiumu, Chief of Lands and survey of American Samoa, the decision of the trial court is affirmed and such land is the communal property of the Puailoa family.

This land consists of 313.61 acres and shall be registered in the name of the Puailoa title holder. It contains the land upon which the Mormon Church has constructed buildings for Church services and pastorage. The Mormons may continue to use so much land as is necessary to maintain and employ these buildings in their religious programs so long as this use continues. All other portions of the judgment, involving matters that were not raised by the pleadings, and indispensable parties that were not joined in the action, are reversed. The reversed portions of the judgment are:

(1) that portion vesting a fee simple interest to the land occupied by the American Samoa Community College in the Government of American Samoa,

---

Accordingly, its intent and effect is limited by the numerous protective provisions discussed at length above. Since under the present law anyone may own freehold land, anyone may acquire it by adverse possessesion. It follows that a matai may acquire communal land for and on behalf of his extended family, and that an individual of 50 per cent or greater Samoan blood may acquire "individually owned" land, by adverse possession. Further, since there are particularly restrictive procedures governing the conversion of communal land into individually owned land [citations omitted], even a person of 50 per cent or greater Samoan blood may not acquire communal land by adverse possession. We do not believe the legislature intended any other result in enacting ASCA section 37.0120. Finally, one might also inquire whether the adverse posession statute has been passed by 2/3 of two successive legislatures. See Article I, Section 3, Revised Constitution of American Samoa.

(2)    that portion vesting a fee simple interest in the land  upon which church buildings have been constructed in the Mormon church,

(3)    that  portion requiring the Puailoa family to reimburse  the Mormon church for buildings constructed on the Puailoa communal land,

(4)    that portion decreeing the rights and obligations occassioned by the payment of $30,000 by the Mormon church to the Puailoa widow,

(5)    that portion purporting to affect unknown leases  which  may have been entered into by the Mormon church with unknown persons,

(6)    that portion purporting to affect the rights and liabilities of persons living on the land by "license" of the Mormon church,

(7)    that portion enjoining the Puailoa family from damaging  the Tongan wall and ordering the Historical Site Preservation Council to  ensure its preservation, and

(8)    that  portion affecting rights and liabilities as to the  60 acres  which was originally leased by but not a part of the  purported ·1953 conveyance to the Mormon church.

Except  for  number 2,  above,  we intend no intimation as to  the  ultimate correctness  of these holdings.   It is our opinion that the matter  pleaded before  the court involved only the right to possession and ownership of the 313.61 acres purportedly conveyed to the Mormons in 1953.   The court had no jurisdictin to decide the peculiar issues and equities raised by its vesting of  title;  nor  did it possess jurisdiction as to parties  not  joined  and matters not pleaded.

We  are aware that a multiplicity of lawsuits may be occassioned by the reversals.  However, the would-be parties should all be mindful that failure to  reach an amicable accord amongst themselves may ultimately result  in  a court judgment far less favorable than they could negotiate.

---------------------

*Honorable Samuel P. King, United States District Court Judge, District of Hawaii,  sitting by designation of the Secretary of the Department of the Interior.