IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37140-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RYAN LEWIS FARR, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Ryan Farr, committed to Eastern State Hospital after pleading not guilty by reason of insanity, appeals the trial court's order authorizing the hospital to test him for drugs. The order, based on inadmissible hearsay, does not specify what type of drug tests are authorized or under what circumstances any particular test may be administered. We reverse and remand so the trial court may consider admissible evidence and remedy the scope of its order.

FACTS

In 2012, the State charged Ryan Lewis Farr with two counts of first degree assault, one count of first degree robbery, and one count of first degree arson. After undergoing competency evaluations, Farr moved for a judgment of acquittal by reason of insanity pursuant to RCW 10.77.080. The trial court accepted Farr's not guilty by reason of insanity plea and ordered him committed to Eastern State Hospital (ESH).

Pursuant to RCW 10.77.140, ESH submitted reports on Farr's treatment and progress every six months. The trial court received 11 reports detailing Farr's behavioral and substance abuse treatment.[1] Early in his commitment, Farr was caught ingesting alcohol-based hand sanitizer. He requested benzodiazepines from his psychiatrist despite being repeatedly denied due to his drug history. In July 2016, staff observed a powdery substance that Farr attempted to hide from view. Staff suspected it was crushed medication but could not obtain a large enough sample to test. In August 2016, Farr was caught with another patient's medication, which he swallowed before it could be confiscated. In September 2016, staff and patients reported Farr tried to obtain other patients' medications. In October 2016, Farr was caught with a substance thought to be hash oil. Shortly thereafter, staff found Farr with a white substance later identified as Wellbutrin, likely taken from another patient.

On December 20, 2017, Farr and another patient used cannabis. ESH staff reported Farr "'appeared intoxicated'" and was "'observed to be high.'" Sealed Clerk's Papers (SCP) at 236. Farr denied using and refused multiple urinalysis (UA) requests. In October 2018, Farr submitted an altered urine sample that was cool to the touch and light in color. Upon request, he provided another sample that tested positive for

_____

[1] The trial court had 10 reports in Farr's file when it issued the challenged order.

2

methamphetamine.  When Farr's treatment team confronted him about his use, he reverted to self-injurious behavior and "'proceeded to bang his head against the treatment room wall several times resulting in a need to be contained.'"  SCP at 240.  Following this incident, Farr began refusing UA requests, stating, "'*it is my right to refuse the UA's, I am taking a stand.*'"  SCP at 242.

In February 2019, Farr displayed "suspicious behavior in the patient dining room," and later was seen "concealing an item (wrapped in folded white paper) within his undergarments and when confronted by staff he rushed to the men's restroom (while a peer blocked staff's entry) and was observed splashing copious amounts of water and liquid soap on and around his mouth and face."  SCP at 248.  Farr denied anything strange happened but refused a UA.  In March 2019, Farr's UA showed the presence of alcohol. His treatment team stated, "This was of great concern given Mr. Farr's history of ingesting (for intoxicating purposes) alcohol-based hand sanitizer and the deleterious effect this would have on his already compromised liver."  SCP at 249.  Farr resumed compliance with UAs until early August 2019.  The May 1, 2019 report stated: "Since 3/13/19, Mr. Farr appears to be making more prudent choices; he has complied with twice weekly urine drug screens and cooperated with room searches," but after describing the obstacles Farr faced concluded, "Mr. Farr remains in need of continued risk mitigation

3

and management given the fragility of his mental illness combined with his polysubstance

use dependence disorder." SCP at 252.

The progress reports repeatedly emphasize the importance of drug screening for

Farr's health and wellbeing given his history of drug abuse and cirrhotic liver. Regularly

scheduled drug tests promote accountability and sustained success in Farr's treatment.

Farr admits he does better when watched, but insists it is his "'right'" not to take UAs.

SCP at 242 (emphasis omitted). Farr's treatment team requested a court order mandating

drug screening in the event Farr refuses UAs and other testing methods in the future.

In September 2019, the State moved for an order permitting ESH to conduct drug

testing of Farr "including urinalysis, nail sample testing, and hair sample testing."

Clerk's Papers (CP) at 145. The motion was based on "the files and records herein, the

declaration of counsel, RCW 10.77.094 and RCW 71.05.217." CP at 145. The

prosecutor's declaration read, in relevant part:

> Dr. Gregory J. Bahder, Psychiatrist, and Chris B. Phillips, MSW and
> Psychiatric Social Worker, Eastern State Hospital, have contacted me.
> They indicated that Mr. Farr was observed on August 12, 2019 appearing
> heavily sedated, slurring his speech and showing difficulty in ambulating,
> and was observed staggering about the ward. He subsequently tested
> positive for a type of benzodiazepine that he is not prescribed. He has since
> refused drug screens as well [as] refused less intrusive methods such as hair
> or fingernail samples. He does say that it is normal for him to periodically
> use drugs even in a secure environment and that this should not be held
> against his progress. He freely expresses that he is not able to maintain

4

sobriety of his own accord. He has been in possession of marijuana and marijuana products . . . . He has tested positive for methamphetamine. He has a history of storing "clean" urine in his room and using this when asked to test. Of primary concern for his treatment team and the hospital is this individual's health and well-being, particularly related to his compromised liver.

CP at 146. Declarations from Dr. Bahder and Mr. Phillips were not attached to the

motion.[2] The court appointed counsel for Farr.

In October 2019, the court held a hearing on the State's motion. The State called

no witnesses and provided no evidence beyond that included in the court's file, including

its declaration.

Counsel for Farr objected to the order, and argued:

The State is relying on [RCW] 10.77.094, which has nothing to do with [its motion today]. There is no specific authorization. Therefore, this must fall [sic].
[Farr's] right to due process under the 4th Amendment, his right under Article 1, Section 7 are being asked to be curtailed. . . . [T]his is a significant fundamental right. The nature of this hearing does not comport with the formality required with regard to any sort of constitutional right being abridged.
. . . .
We do need to have testimony . . . .
It is a fundamental right to his liberty. . . . The State is asking to be able to hold him down and pull hair out of his head.

---

[2] Farr correctly notes that some of the information relayed in the prosecutor's statement was not in the court file when the court ruled. Some of the information is in Farr's November 1, 2019 progress report.

I don't think this is something that we should take lightly with a two page affidavit that's comprised solely of hearsay.

Report of Proceedings (RP) (Oct. 14, 2019) at 7-8.

The court granted the order authorizing ESH to conduct drug testing of the defendant, "*including* urinalysis, nail sample testing, and hair sample testing." CP at 158 (emphasis added). The written order included the following findings:

1. The defendant was found not guilty of [sic] reason of insanity of Assault in the First Degree and committed to Eastern State Hospital on November 1, 2013.
2. The defendant has tested positive for controlled substances that are not normally prescribed for patients at Eastern State Hospital, including but not limited to certain benzodiazepines, methamphetamine, and marijuana.
3. The defendant has since refused drug screens as well [as] refused less intrusive methods such as hair or fingernail samples.
4. The defendant's fragile liver and overall hepatic health continue to be in danger without the ability to perform drug screens.

CP at 157-58.

Farr timely appealed the order.

ANALYSIS

Farr raises three arguments. We separate his first argument into two subparts: (1) the order must be reversed because (a) there is no statutory authority supporting it and (b) its findings of fact are based on hearsay; (2) because of the important privacy interests at stake here, due process requires a hearing with live witnesses subject to cross-

6

examination; and (3) the order violates Farr's privacy rights under the state and federal constitutions.

STATUTORY AUTHORITY

Farr argues there is no statutory authority for state hospitals to involuntarily drug test persons acquitted by reason of insanity. The State responds that both RCW 10.77.094 and RCW 10.77.210 support the trial court's order. We partly agree with the State.

We review issues of statutory construction de novo. *State v. Dennis*, 191 Wn.2d 169, 172, 421 P.3d 944 (2018). When engaging in statutory interpretation, our primary goal is to effectuate legislative intent. *Id.* We derive legislative intent from the plain language of the provision, its context within the statute, and the statutory scheme as a whole. *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013).

RCW 10.77.094 provides in relevant part: "A state hospital may administer antipsychotic medication without consent to an individual who is committed under this chapter as criminally insane" following procedures outlined in chapter 71 RCW. This statute does not authorize involuntary drug testing of committed persons.

RCW 10.77.210 provides in relevant part: "Any person involuntarily detained, hospitalized, or committed pursuant to the provisions of this chapter shall have the right to adequate care and individualized treatment." Especially here, where Farr's weak liver

could be further damaged by toxic substances, adequate care and individualized treatment

includes preventing substance abuse. Monitoring for substance abuse is an integral part

of preventing it. We conclude that RCW 10.77.210 authorizes a trial court to order drug

testing if adequate care and individualized treatment so warrant.

HEARSAY

Farr contends the trial court's order authorizing drug testing was based on hearsay.

He argues findings of fact 2, 3, and 4 were based on hearsay in the prosecutor's

declaration and the remaining unchallenged finding does not support the trial court's

order. We agree.

CR 7(b) governs motions in criminal cases. CrR 8.2. CR 7(b) permits a party to

apply to a court for an order, commonly referred to as a motion. A party filing a motion

has the burden of presenting sufficient facts to warrant the court's exercise of discretion

in the party's favor. *State v. Aldana Graciano*, 176 Wn.2d 531, 539, 295 P.3d 219

(2013). Facts supporting a motion must be presented by a sworn affidavit or an unsworn

written statement (declaration, verification, or certificate) in a form prescribed by statute.

RCW 9A.72.085. If a party properly objects to inadmissible evidence, a court must not

consider it.

In general, hearsay is not admissible. ER 802. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). ESH's reports in the court file are hearsay, as is the prosecutor's declaration of what two individuals said.

ER 1101(c) permits a court to consider hearsay evidence in various situations. The State does not assert, nor do we believe, that any provision of this rule applies here. We conclude that the order is not supported by admissible evidence. We, therefore, reverse and remand so the State may present admissible evidence to support its motion, such as two declarations and attachments.

PROCEDURAL DUE PROCESS

Farr contends his right to procedural due process was denied because the trial court did not permit him to call or cross-examine witnesses. Because this issue will present itself on remand, we address Farr's argument.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)). When analyzing due process claims, we consider three factors:

>	First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

The first *Mathews* factor directs us to consider the private interest affected. Here, the private interest depends on the intrusiveness of the particular type of drug test ESH wishes to administer. For instance, Farr's privacy interest is minimally affected by a nonintrusive urinalysis or a nail sample, it is moderately affected by a blood draw, and it is significantly affected by use of a catheter to obtain a urine sample.

The second *Mathews* factor requires us to consider the risk of an erroneous decision and the probable value of Farr's proposed additional procedures. The facts the trial judge will rely on will be supplied by professionals who are charged with ensuring Farr's health and recovery. We doubt they have any motive to fabricate or embellish. Cross-examination is unlikely to uncover a mistake or any deceit in the facts or opinions they present to the court. Nevertheless, permitting Farr to question one or both witnesses—either by deposition or in court—might assist the court in crafting a narrower, yet workable, order. Alternatively, Farr can present a declaration from his own expert to

10

assist the court. Farr's ability to cross-examine one or both witnesses may be useful, but it is not necessary.

Finally, the third *Mathews* factor directs us to consider the State's interest and the fiscal and administrative burdens additional procedures would entail. ESH has a statutory duty to provide adequate care and individualized treatment for all committed persons under its care. RCW 10.77.210. Requiring multiple professionals to appear in court, perhaps 200 miles away, to obtain an order permitting drug testing would both burden ESH and might jeopardize the care of others under its care.

Weighing the three *Mathews* factors, we conclude that Farr's right to procedural due process would not be violated by a nontestimonial hearing, unless the State sought to use a highly intrusive drug test. Nevertheless, the trial court might consider permitting Farr to depose one or both witnesses if doing so would assist the court in crafting an appropriate order.

PRIVACY RIGHTS

Farr and amici curiae[3] argue that the trial court's overly broad order violates Farr's privacy rights under article I, section 7 of the Washington Constitution. Farr asserts that

---

[3] Disability Rights Washington and the American Civil Liberties Union of Washington Foundation.

11

No. 37140-9-III
*State v. Farr*

his status as an acquittee provides him greater privacy rights against drug testing than the convicted probationer in *State v. Olsen*, 189 Wn.2d 118, 399 P.3d 1141 (2017). Amici curiae assert that the order erroneously permits ESH to drug test Farr without reasonable suspicion and to obtain a urine sample by forced catheterization.

We do not reach these arguments because we have reversed the order on other grounds and any discussion of these issues would be an improper advisory opinion. *Walker v. Munro*, 124 Wn.2d 402, 411-12, 879 P.2d 920 (1994). We are confident the trial court can issue a narrowly tailored order that authorizes ESH to administer specific and appropriate drug tests under appropriate circumstances consistent with its duty to provide Farr adequate care and individualized treatment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Korsmo, A.C.J.

Fearing, J.

12